# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **NANCY ROBERTS** and **GEORGE ROBERTS**, *as trustee of the George Tudor Strong Roberts and Nancy Jane Roberts Chapter 11 Estate*, | Case No. 3:12-cv-01820-SI |
| Plaintiffs, | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| v. | |
| **THE HEATING SPECIALIST INC., ROBERT GORDON**, and **IRS ENVIRONMENTAL OF PORTLAND, INC.,** | |
| Defendants. | |

Kenneth P. Dobson, CHENOWETH LAW GROUP, PC, 510 S.W. Fifth Avenue, Portland, OR 97204. Of Attorneys for Plaintiffs.

Gregory W. Byrne, BUCKLEY LAW PC, 5300 Meadows Road, Suite 200, Lake Oswego, OR 97035. Of Attorneys for Defendant The Heating Specialist Inc.

**Michael H. Simon, District Judge.**

Plaintiffs Nancy Roberts and George Roberts (collectively "Plaintiffs"), trustees of the

George Tudor Strong Roberts and Nancy Jane Roberts Chapter 11 Estate, seek contribution from

Defendant The Heating Specialist Inc. ("Defendant" or "THS") under Section 113 of the federal

Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42

PAGE 1 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

U.S.C. §§ 9601-9675. THS denies that it is liable under CERCLA and further argues that the service contract between the parties limits THS' liability.

The Court has jurisdiction over this matter under 28 U.S.C. § 1331. The Court held a bench trial on June 18 and 19, 2014. Having weighed and evaluated all of the evidence in the same manner that it would instruct a jury to do and having fully considered the legal arguments of counsel, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a) ("Rule 52(a)").

**FINDINGS OF FACT**

The Court finds the following facts by a preponderance of the evidence.

**A. Stipulated Facts**

1.      Plaintiffs are New Mexico residents and trustees of their Chapter 11 bankruptcy estate administered under the case filed on January 7, 2011, in the U.S. Bankruptcy Court for the District of New Mexico entitled *In re Roberts*, Case No. 11-10058-j11.

2.      Plaintiff Nancy Roberts is the owner of residential rental property located at 909 S.W. Washington Street, Oregon City, Oregon (the "Property").

3.      Defendant THS is an Oregon corporation engaged in the business of boiler system sales, installation, and repairs.

4.      In February 2011, THS replaced a boiler located in the basement of the Property pursuant to a written contract between THS and Plaintiffs. THS removed the old boiler from the Property with the intent to dispose of the old boiler.

5.      The U.S. Environmental Protection Agency ("EPA") asserted a claim under § 107 of CERCLA, 42 U.S.C. § 9607, against Plaintiffs in the bankruptcy action, seeking recovery of $124,441.00 for environmental investigation and cleanup costs that the EPA incurred responding to the suspected release of mercury at the Property.

PAGE 2 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

6.      Defendant IRS, Inc. ("IRS")[1] is an Oregon corporation engaged in the business of asbestos, lead, and hazardous substance abatement.

7.      Defendant Robert Gordon is an Oregon resident and serves as the Environmental Safety Officer of IRS.

8.      The Property was vacant in February 2011. Plaintiffs listed the Property for rent with a realtor. There was a lockbox on the Property.

9.      THS removed and replaced the old boiler on February 17, 2011. THS gained access to the Property by using the lockbox.

10.     Between February 17, 2011 and March 24, 2011, approximately 11.2 inches of precipitation was recorded at Oregon City, Oregon.

11.     On March 23, 2011, Clackamas County Fire District #1 and the City of Gresham Hazmat Team #3 responded to a report of a mercury spill at the Property. An Oregon City Public Works official contacted Plaintiffs on March 24, 2011. Plaintiffs contracted with IRS to clean up and remove the mercury from the Property.

12.     On March 29, 2011, EPA inspectors visited the Property to begin performing a site assessment.

13.     EPA inspectors also found mercury contamination at 911 S.W. Washington Street, across the alley from the Property. A family with four children, ages 9 through 15, lives at that address.

14.     Following IRS' remediation attempt, Plaintiffs attempted to clean up the mercury themselves. They were not successful in removing all of the mercury.

---

[1] Pursuant to an agreement among the parties, the Court entered a stipulated judgment dismissing Plaintiffs' claims against Defendants IRS, Inc. and Robert Gordon and a stipulated judgment dismissing the crossclaims asserted by IRS, Inc. and Robert Gordon. Dkts. 120, 121.

15. Following Plaintiffs' cleanup attempt, the EPA hired contractors to conduct the cleanup and removal. The EPA completed the cleanup on May 11, 2011.

16. Plaintiffs settled with IRS and Gordon and will assume their allocated fault.

## B. Facts the Court Finds Established at Trial

### 1. Credibility of Witnesses

In these findings of fact, the Court relies on the testimony of the following six witnesses who testified at trial: Nancy Roberts, Otto Loenneker, T. Jeff O'Neal II, Ron Schweiger, Daniel Brent, and David Brent. The Court also relies on the declarations of the following four individuals submitted in lieu of live testimony: Jeffrey Fowlow, Jeff Strong, Shermalee Fae Roake, and Cory Strong. Having observed and considered the testimony of each of the live witnesses, the Court concludes that all live witnesses other than Mrs. Roberts and David Brent provided fully credible testimony.[2] The Court has some doubts regarding the full credibility of both Mrs. Roberts and David Brent based on contradicting testimony provided by other witnesses.

Mrs. Roberts explained the circumstances of the EPA cleanup based on her recollection, specifically stating that she fully consented to the EPA's inspection of the Property and took extensive precautions in her independent attempt to clean up the mercury. Jeffrey Fowlow, the EPA On-Scene Coordinator ("OSC") who directed and oversaw the EPA's CERCLA remediation action at the Property, however, explained that Mrs. Roberts: (1) revoked her

---

[2] Plaintiffs originally designated Jeffrey Fowlow as a live witness but later chose to not call Mr. Fowlow at trial. Instead, Plaintiffs submitted a portion of a declaration from Mr. Fowlow filed in the proceeding pending in the United States Bankruptcy Court for the District of New Mexico. At the Court's request, the entire declaration was then received into evidence. The Court did not have the ability to assess Mr. Fowlow's credibility in live testimony. The Court notes, however, that Mr. Fowlow has no vested interest in the dispute pending before the Court, and Plaintiffs presented no evidence to impeach Mr. Fowlow's credibility. The Court therefore fully credits the facts set forth in Mr. Fowlow's declaration.

consent to access the Property; (2) postponed her meeting with Jeffrey Fowlow in order to undertake and attempt herself to clean up the mercury at the Property; (3) failed to get a receipt documenting that she disposed of contaminated materials at a hazardous waste site; (4) admitted that she did not wear protective equipment, including booties (shoe coverings), when she conducted her cleanup of mercury at the Property; and (5) refused either to hire a contractor or grant the EPA access to the Property after her failed cleanup efforts. The Court has no reason to doubt the veracity of Jeffrey Fowlow's declaration and finds that the contradictions noted above undermine the Court's ability fully to rely on Mrs. Roberts' testimony. This conclusion is also buttressed by the fact that Mrs. Roberts stated on several occasions that she had difficulty recalling the events at issue in this dispute.

David Brent's testimony was at times in conflict with the testimony of Mr. Loennecker and Mr. Schweiger. David Brent explained that he was in the basement of the Property during the installation of the new boiler system and that there were no parts of the old boiler system that contained mercury. Yet Mr. Loennecker testified that David Brent did not participate in the physical labor of dismantling the old boiler system and was designing the new boiler system during that time. Although David Brent may not have directly observed a component that could contain mercury in the old boiler system, his limited participation in dismantling the system means that his testimony on this issue has limited probative value. Further, David Brent's testimony that no vehicles from THS were parked in the driveway at the Property is in conflict with Mr. Schweigers' testimony. Mr. Schweiger, a neighbor living adjacent to the Property, observed a white van with a THS logo parked in the driveway of the Property while THS was removing the boiler. Mr. Loennecker also noted that Daniel Brent, a THS employee involved in the removal of the old boiler system, may have driven his van around to the driveway

immediately behind the Property. These contradictions indicate that portions of David Brent's testimony may not accurately reflect the relevant facts in this case.

### 2. Old Boiler Removal and New Boiler Installation

When Mrs. Roberts purchased the Property, the boiler system in use was old and outdated. The three previous owners of the Property stated that they had not replaced the boiler system. After consulting with a real estate agent, Mrs. Roberts received advice that she should update the boiler system if she ever planned to sell the home. Mrs. Roberts then consulted with several companies, including THS, in order to get bids to do the work.

On February 10, 2011, Mrs. Roberts accepted THS' proposal to remove and replace the old boiler system at the Property. THS began work on February 17, 2011, and completed the boiler removal and installation on February 18, 2011. Three THS employees were assigned to the project: (1) David Brent, certified with a State of Oregon Class 3 Boilers License and the president of THS; (2) Otto Loennecker, certified with a State of Oregon Class 1 Boilers License and an employee of THS beginning in 2004; and (3) Daniel Brent, employed by THS beginning in 2010 as a helper and installer and David Brent's son. The three people accessed the Property by using a code for a lockbox that Mrs. Roberts provided to THS. Mrs. Roberts also gave the lockbox code to a prospective tenant and a realtor. Mr. Schweiger, a neighbor, did not observe any other individuals entering or leaving the Property while it was unoccupied. At least one van owned by THS and used in the boiler removal and installation process was parked in the driveway of the Property.

During the removal process, Daniel Brent and Otto Loennecker focused their efforts on removing the old boiler system, and David Brent focused his efforts on custom designing the new boiler system. The THS personnel were in the basement during the February 17, 2011 removal of the old boiler system. The basement had dim lighting. Mr. Loennecker observed that

PAGE 6 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

the old boiler system looked very old, that the boiler had "atomic" lettering that could be from the 1960s, and that the pump that was a part of the active system probably dated back to the 1940s. Mr. Loennecker disconnected the old boiler from the Property's electrical system, cut the wires to the old boiler controls, and disconnected the natural gas connections to the old boiler. He then drained the water from the old boiler by connecting one end of a hose to the boiler and leading the other end of the hose to a drain in the basement. Although some water may have spilled on the basement floor during the process, the drain in the basement floor did not clog. Some water remained at the bottom of the boiler after Mr. Loennecker completed the draining. He then used a Sawzell electric reciprocating saw to dismantle the old boiler system by cutting through pipes.

Mr. Loennecker described the old boiler system as having multiple parts, including the large square boiler, a red electrical pump, exhaust components, a lighter at the top of the boiler, a burner for the boiler near the bottom of the boiler, and various other controls for the boiler. While he was completing his work dismantling the old boiler system, Mr. Loennecker did not see a Honeywell heat generator attached to the boiler system, but also explained that he had no experience removing such a device. Daniel Brent also explained that he did not notice a Honeywell heat generator and that he only became familiar with such a device after this litigation began.

Mr. Loennecker dismantled the old boiler system and then worked with Daniel Brent to carry the boiler and various pipes and components up from the basement to the driveway. The old boiler weighed approximately 400 pounds. To navigate the old boiler up from the basement, Mr. Loennecker and Daniel Brent placed the boiler on a hand truck commonly used to move large appliances. During the process of moving the boiler from the basement, Mr. Loennecker

and Daniel Brent tilted the boiler in order to move through corners on the ramp leading up to the driveway. Throughout this moving process, it was possible for water to leak out of the boiler. The THS personnel followed the same path when carrying the other old boiler components and pipes to the driveway.

On February 17, 2011, after THS removed the old boiler system, David Brent worked with Mr. Loennecker to install the new boiler system that David Brent designed. On February 18, 2011, THS returned to the Property to replace a defective radiator in the attic of the Property. THS completed its work at the Property that day.

### 3. The Honeywell Heat Generator

Mr. O'Neal, a mechanical engineer and Plaintiffs' retained expert, provided expert testimony on the nature of the old boiler system at the Property. Mr. O'Neal has specific experience in, among other areas, the field of heating, ventilation, and air conditioning ("HVAC") specifications, installations, and forensic analysis of those systems. As explained by Mr. O'Neal, some boiler systems historically used mercury, including switches that contained a bulb of mercury and Honeywell heat generators that contained various amounts of mercury depending on the size of the boiler system. The Honeywell heat generator was used in gravity-based boiler systems and was developed in 1904. The function of the Honeywell heat generator was to heat water safely beyond the boiling point. The Honeywell heat generator also prevented explosions resulting from spring-based gravity controls that were unable effectively to regulate water pressure.

The mercury in the Honeywell heat generator is at the bottom of the device when in its dormant state but, when active, the mercury rises in a central column to regulate the temperature and prevent the boiler from overheating. The mercury is self-contained within the Honeywell heat generator and does not generally escape into the boiler system. The appropriate-sized

Honeywell heat generator needed to function in a building the size of the Property would require approximately four to ten fluid ounces of mercury. Each fluid ounce of mercury weighs approximately one pound. Honeywell heat generators are installed below the expansion tank. Expansion tanks may be found either in a lower area like a basement but above the Honeywell heat generator, or above the uppermost radiator (either on a higher floor or on the roof of the house). Although Honeywell heat generators are no longer commonly found in boiler systems, Mr. O'Neal has encountered various components from the same era as the Honeywell heat generator at the Property. Mr. O'Neal explained that there may be components from multiple eras in the same boiler system if that system has been partially repaired or updated over time.

Mr. O'Neal inspected the new boiler system and found, in addition to the system designed by David Brent, an Aquastat temperature control manufactured by Minnesota Honeywell, the same company that manufactured the Honeywell heat generator. The Aquastat temperature control was attached to piping that was not replaced by THS and was surrounded by white wrapping that may have contained asbestos. Mr. O'Neal opined that the Aquastat temperature control was designed to work in conjunction with the Honeywell heat generator and that it was likely that a boiler system would be designed to use components from the same manufacturer, in this case, Honeywell. Further, Mr. O'Neal explained that although an electric pump (used in the old boiler system replaced by THS) and a Honeywell heat generator would not function in the same system, it is possible to update a boiler system to use only an electric pump, disconnect a Honeywell heat generator, but not remove the Honeywell heat generator from the piping.

In addition to the presence of the Aquastat temperature control, Mr. O'Neal opined that the old piping found at the Property was uniquely capable of servicing a boiler system that used a

Honeywell heat generator. Specifically, the Honeywell heat generator necessitates that the piping directed away from the boiler be the same size. Further, Mr. O'Neal explained that the piping branching out from the first-floor radiator would need to be two commercial pipe sizes smaller than the piping directed away from the boiler. Mr. O'Neal observed this configuration at the Property. In comparison to a pumped system, a system using a Honeywell heat generator uses pipe sizes that progressively get smaller to keep the water flowing at the correct pressure level. Mr. O'Neal also observed piping that looked like the connecting pipe from the Honeywell heat generator to an expansion tank. Based on these facts and the expert opinion of Mr. O'Neal, the Court finds that the layout of the old boiler system was compatible with the presence of a Honeywell heat generator and provides circumstantial evidence that such a device was present on the old boiler system at the Property.

### 4. Mercury Spill at the Property

Approximately five weeks after THS completed its work at the Property, Mrs. Roberts gave a prospective tenant access to the Property. The prospective tenant discovered mercury beads and reported what she observed to the Clackamas County Fire District #1. The time, quantity, and location of the mercury found at the Property all support the conclusion that the mercury came from a Honeywell heat generator removed by THS on February 17 and 18, 2011. Based on the timing of these events, there is no credible explanation for the presence of mercury at the Property other than THS' work at the Property. Although THS argues that vagrants, homeless individuals, children, or a scrap metal dealer could have deposited the mercury, the Court notes that these theories are not supported by a preponderance of the evidence. Mr. Schweiger, the neighbor, also noted that he did not observe anyone accessing the Property during the relevant time period. Further, Mr. Schweiger observed silver balls (mercury) in the driveway in front of the detached garage a few days after THS installed the new boiler system.

PAGE 10 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

Even more persuasive than the timing evidence, the quantities and locations of the mercury found provide strong evidence that the mercury came from THS' activities in removing the old boiler system. THS cites to hand-written notes from an EPA inspector from March 30, 2011 stating that there were "[b]eads around water heater in 909 basement" to argue that mercury was found next to the water heater and not the new boiler system. Mr. Fowlow, however, explained that the March 30, 2011 report from the EPA investigators noted that mercury beads were "observed in the house's basement directly adjacent to a new boiler." The draft mercury vapor assessment prepared as part of the EPA's investigation similarly documented mercury beads next to the new boiler. Further, Mr. Fowlow's declaration corroborated the EPA investigator's map and confirmed that several individuals observed mercury near the newly installed boiler. All other documentation from the EPA indicates that pools of mercury beads were found next to the new boiler in the basement of the Property, in the driveway directly next to the staircase leading up from the basement, and directly in front of the detached garage. These locations where mercury at the Property was found parallel almost perfectly the work path of the THS personnel who removed the old boiler system.

Because much of the mercury removed from the driveway at the Property had seeped through cracks and because mercury at the Property was spread around before the EPA's remediation efforts, the exact quantity of mercury at issue is not known to a certainty. Mr. O'Neal, however, established that his expert review of the relevant evidence indicated that approximately four fluid ounces of mercury were found at the Property. Although THS argues that there was much more mercury at the Property than an appropriately-sized Honeywell heat generator would likely contain, there is no circumstantial or direct evidence to support this inference.

PAGE 11 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

THS primarily relies on the approximately 11.2 inches of rain that was recorded in Oregon City, Oregon between February 17, 2011 and March 24, 2011, to argue that the rain washed away much of the mercury in the driveway of the Property. THS did not prove by a preponderance of the evidence, however, that the mercury found in the driveway, which is heavier than water, would be flushed down the driveway drain or washed away. Moreover, the evidence of rain does not outweigh the strong circumstantial evidence based on the locations of mercury found in the basement indicating that the mercury likely came from the old boiler system. The Court finds that the quantity of mercury found at the Property is consistent with the amount of mercury an appropriately-sized Honeywell heat generator for the Property likely would contain.

In civil litigation a plaintiff typically must prove his case by a preponderance of the evidence and may use either direct or circumstantial evidence to do so. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99 (2003). Although there is no direct evidence of a mercury spill, there are several facts in the record from which this factfinder may determine the source of the mercury spill. *See* 9th Cir. Jury Instructions Comm., *9th Cir. Manual of Model Civil Jury Instructions* § 1.9, at 36 (2007) (explaining the nature of circumstantial evidence and that the "law makes no distinction between the weight to be given to either direct or circumstantial evidence"); *see also Franklin Cnty. Convention Facilities Auth. v. Am. Premier Underwriters, Inc.*, 240 F.3d 534, 547 (6th Cir. 2001) ("[T]here is nothing objectionable in basing findings solely on circumstantial evidence, especially where the passage of time has made direct evidence difficult or impossible to obtain."); *Ticor Title Ins. Co. v. Florida*, 937 F.2d 447, 450 (9th Cir. 1991) ("circumstantial evidence can stand alone in proof of any fact").

Based on the evidence regarding the quantities, locations, and timing of the mercury found at the property and the evidence related to the characteristics of the Honeywell heat generator, the Court finds that it is more likely than not that an older Honeywell heat generator, which contained mercury, was present in the basement of the Property. Moreover, the Court finds that Plaintiffs established by a preponderance of the evidence that THS removed an old Honeywell heat generator (albeit without the employees fully understanding and appreciating that such a device was present in the basement) and in the process caused mercury to be released at the Property.

### 5.    Remediation Activities at the Property

On March 24, 2011, the EPA received a report of the incident, one day after the initial report from Mrs. Roberts' prospective tenant. The local authorities initially stabilized the contamination and limited access to the contaminated areas. The EPA conducted an investigation and site assessment on March 29 and 30, 2011. During that assessment, the EPA found significant levels of mercury in the basement next to the boiler, on a walkway leading along the outside of the house from the basement door, and free mercury beads over a wide area directly in front of the house's detached garage. Further, the EPA's mercury vapor assessment results indicated that there were vapors in the basement, in the walkway and in front of the detached garage, in the public right of way separating the Property from the Schweigers' residence, and on the Schweigers' property.

Local authorities also informed Mrs. Roberts of the spill on March 24, 2011. Within 48 hours, Mrs. Roberts left San Diego, California to travel to the Property in Oregon to handle the situation. Mrs. Roberts researched companies that could clean the spill, and she received a price estimate from IRS for $900. Mrs. Roberts hired IRS, and she assumed the work would be completed. After IRS finished its work, Mrs. Roberts received a call from an official from

Oregon City informing Mrs. Roberts that there were still beads of mercury underneath a tarp in front of the garage on the Property. Mrs. Roberts then inquired with IRS about the project, and they recommended that Mrs. Roberts hire another company, Waste Management. Mrs. Roberts explained to Waste Management that there were potentially nine cubic centimeters of mercury at the Property. Waste Management gave Mrs. Roberts an estimate of $14,000 to remediate the mercury spill, which she declined. No further activity was performed by IRS, and no remediation activity was performed by Waste Management.

Mrs. Roberts was also in contact with the EPA. She contends that her primary contact at the EPA was Richard Franklin, to whom Mrs. Roberts gave permission to access the Property along with the code to the lockbox. Mrs. Roberts did not give IRS, Waste Management, or any other government agency involved in the mercury spill cleanup the code to the lockbox. Mr. Franklin accessed the house, informed Mrs. Roberts that there were mercury beads in the basement, and that the EPA would be sending staff from Seattle.

Mr. Fowlow, the EPA OSC, made several attempts to get consent from Mrs. Roberts to access the Property. Mr. Fowlow initially contacted Mrs. Roberts on April 5, 2011, and she granted the EPA access to the Property at the time. Later that day, however, Mrs. Roberts revoked her consent for him to have access. Mr. Fowlow attempted to contact Mrs. Roberts on April 6, 2011, spoke with her on Thursday, April 7, 2011, and arranged to meet her at the Property on Sunday, April 10, 2011. On Friday, April 8, 2011, Mr. Fowlow attempted to reach Mrs. Roberts twice by phone and left a message to confirm their appointment. The next day on April 9, 2011, Mr. Fowlow reached Mrs. Roberts to confirm their appointment to meet on Sunday, April 10, 2011. Mrs. Roberts, however, postponed the meeting until April 11, 2011, even though she was already onsite at the Property.

Before arriving at the Property, Mrs. Roberts searched the Internet to learn how to remediate a mercury spill. She learned that she could spread "kitty litter" or sulfur, which would render the mercury inert. It could then be swept up.

On or before April 9, 2011, Mrs. Roberts bought sulfur from a plant store, went to the basement of the Property, and spread the sulfur "all over the place." She also placed sulfur in the driveway in front of the detached garage. Mrs. Roberts then swept up the mixture with the mercury after she observed it turning brown, which she believed indicated absorption of the mercury into the sulfur. She placed the mercury-sulfur mixture in a five-gallon bucket. Mrs. Roberts applied additional sulfur to the driveway three or four more times. After completing this process, she then took the bucket to a hazardous waste disposal site in Oregon City, Oregon.

On April 9, 2011, after Mrs. Roberts postponed her meeting with Mr. Fowlow, Mr. Fowlow telephoned the Schweigers, the neighbors adjacent to the Property, to get their consent to inspect their property. The Schweigers provided consent to Mr. Fowlow and informed him that Mrs. Roberts was spreading yellow powder on her driveway. Mr. Fowlow then went directly to the Property, arriving at 5:15 p.m. The Schweigers granted Mr. Fowlow access to their property so that Mr. Fowlow could see where Mrs. Roberts had spread yellow powder. Mr. Fowlow observed yellow footprints leading onto the Schweigers' property.

At 7:30 p.m., Mr. Fowlow contacted Mrs. Roberts and asked her what activities she had conducted during the day. She explained her cleanup efforts. Although Mrs. Roberts testified at trial that she had taken the mercury-sulfur mixture to an authorized hazardous waste facility, Mr. Fowlow's declaration explains that Mrs. Roberts had no receipt from any such facility. Mrs. Roberts also admitted to Mr. Fowlow that she did not wear protective neoprene booties or

any other standard personal protective equipment, although Mrs. Roberts testified at trial that she did. Further, Mrs. Roberts admitted to Mr. Fowlow that she walked from the most contaminated area, the area in front of the detached garage, across the right-of-way separating the Property from the Schweigers' house to speak with the Schweigers. In the process, she tracked mercury-contaminated sulfur onto their property. After providing Mr. Fowlow with this summary, Mrs. Roberts granted Mr. Fowlow access to the Property. Mr. Fowlow inspected the Property and concluded that there was a release of hazardous substances that posed a risk to human health and that contamination was being spread due to inappropriate cleanup methods and unreasonable delays in executing the cleanup.

On Sunday, April 10, 2011, Mr. Fowlow accessed the basement of the Property with Mrs. Roberts' consent to document mercury levels. Mr. Fowlow concluded that Mrs. Roberts' cleanup work had made matters worse by spreading contamination from areas with higher concentrations of mercury into areas with lower concentrations of mercury. Mr. Fowlow gave Mrs. Roberts the option of hiring a qualified, equipped, and experienced contractor or giving consent to the EPA to conduct the cleanup work at the Property. Mrs. Roberts indicated that she did not have the money to hire a contractor because she was going through a bankruptcy, that she would not consent to the EPA without first speaking to Mr. Franklin, to her bankruptcy attorney, and to her insurance company, and that she intended to conduct the cleanup herself beginning on Tuesday, April 12, 2011.

Mr. Fowlow interpreted Mrs. Roberts' response as a refusal to choose either option that was given to her. Based on Mrs. Roberts' response, Mr. Fowlow believed that Mrs. Roberts did not understand or appreciate the need to expedite the cleanup in order to prevent further contamination and public health risks and that Mrs. Roberts lacked the resources and experience

necessary to manage the cleanup. At this point, the EPA sought a court order to get access to the Property to identify the release or threatened release of hazardous substances, to conduct further investigation and chemical inventory as necessary, and to remove hazardous substances and waste. The EPA obtained this court order on April 12, 2011.

On April 13, 2011, the EPA began its CERCLA response action at the Property. The EPA disposed of 39,900 pounds of mercury-contaminated material using roll-off bins, of which approximately 30,000 pounds came from the Property. The EPA also disposed of one drum of material heavily contaminated with mercury, of which approximately 95 percent was attributable to the Property. The EPA removed the original concrete driveway, replaced the drain box, and put in a new driveway. The EPA also repaved the right of way separating the Property and the Schweigers' residence. The EPA completed its remediation work on May 11, 2011.

CONCLUSIONS OF LAW

Based on the foregoing Findings of Fact and the legal standards that follow, the Court makes the following Conclusions of Law.

**A. Liability Under CERCLA**

Congress designed CERCLA to promote the "timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination." *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009) (citation and quotation marks omitted); *see also Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 483 (1996). There are two forms of legal action under CERCLA by which parties may recoup some or all of their costs associated with the cleanup of hazardous waste. The first is a cost recovery action under § 107(a). 42 U.S.C. § 9607(a). The second is a contribution action under § 113(f). 42 U.S.C. § 9613(f)(1); *see also United States v. Atl. Research Corp.*, 551 U.S. 128, 129 (2007) ("Section 113(f)(1) authorizes a contribution action to PRPs [potentially responsible

PAGE 17 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

parties] with common liability stemming from an action instituted under § 106 or § 107(a), while § 107(a) permits cost recovery (as distinct from contribution) by a private party that has itself incurred cleanup costs.").

Pursuant to CERCLA, Congress authorized federal and state governments to "begin the cleanup of toxic areas, *see* §§ 9604(a)-(d), and then sue potentially responsible parties (PRPs) for reimbursement, *see* § 9607(a)." *United States v. Burlington N. & Santa Fe Ry. Co.*, 520 F.3d 918, 933 (9th Cir. 2007), *reversed on other grounds by Burlington N. & Santa Fe Ry. Co. v. United States*, 566 U.S. 599 (2009). A party who is liable under § 107 is jointly and severally liable for the *entire* harm, irrespective of the fact that other parties may have contributed to the harm. *See O'Neil v. Picillo*, 883 F.2d 176, 179 (1st Cir. 1989) ("Congress intended for those proven at least partially culpable to bear the cost of the uncertainty"). Parties held jointly and severally liable under § 107 of CERCLA that believe they have "assumed a share of the cleanup or cost that may be greater than [their] equitable share under the circumstances, . . . may bring an action under § 113." S. Rep. No. 99-11 (1985), reprinted in Arnold & Porter LLP Legislative History: P.L. 99-499, *available at* 1985 WL 728142, at *40. Such a party must affirmatively establish by a preponderance of the evidence some basis for dividing the harm. *See United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 268 (3d Cir. 1992).

Section 113(f)(1), 42 U.S.C. § 9613(f)(1), provides:

> Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title. Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a

civil action under section 9606 of this title or section 9607 of this title.

Thus, to prove a contribution claim under § 113 of CERCLA, a plaintiff must allege and satisfy the elements of § 107, 42 U.S.C. § 9607(a). *3550 Stevens Creek Assoc. v. Barclays Bank of Cal.*, 915 F.2d 1355, 1358 (9th Cir. 1990), *cert. denied*, 500 U.S. 917 (1991); *see also Kaiser Aluminum & Chem. Corp. v. Catellus Dev. Corp.*, 976 F.2d 1338, 1340 (9th Cir. 1992) (under § 113, a plaintiff can seek contribution from any liable party as defined in § 107). These elements require that:

(1) the defendant fall within one of four classes of persons described in § 107(a) of CERCLA's liability provisions (42 U.S.C. §§ 9607(a)(1)-(4));

(2) the waste disposal site is a "facility" as defined by CERCLA § 101(9) (*id.* at § 9601(9));

(3) a "release" or "threatened release" of a "hazardous substance" from the facility has occurred (*id.* § 9607(a)(4)); and

(4) the "release" or "threatened release" caused the plaintiff to incur response costs (*id.* §§ 9607(a)(4) and (a)(4)(B)).

*City of Colton v. Am. Promotional Events, Inc.-W.*, 614 F.3d 998, 1002-03 (9th Cir. 2010); *see also Cose v. Getty Oil Co.*, 4 F.3d 700, 703-04 (9th Cir. 1993); 42 U.S.C. §§ 9601, 9607(a).

### 1.  Liable Parties under CERCLA

Section 107(a) of CERCLA defines what entities are subject to liability.[3] CERCLA's definition of a "person" includes a "corporation." 42 U.S.C. § 9601(21); *Am. Tel. & Tel. Co. v.*

---

[3] Under CERCLA § 107(a), causation is established if a person falls within one of the four relevant categories and that person causes a release of a hazardous substance. 42 U.S.C. § 9607(a)(1)-(4). Thus, traditional notions of "causation" need not be proven at this trial. *See New York v. Shore Realty Corp.*, 759 F.2d 1032, 1044-45 (2d Cir. 1985); *United States v.*

*Compagnie Bruxelles Lambert*, 94 F.3d 586, 591 n.8 (9th Cir. 1996). The Court concludes that THS is a person under § 101(21) of CERCLA because it is a corporation.

Four classes of covered persons may be liable under CERCLA, 42 U.S.C. §§ 9607(a)(1)-(4). Relevant to this action, the Court addresses whether THS is an "operator" under CERCLA. *See* 42 U.S.C. § 9607(a)(2). CERCLA defines an owner or operator as "any person owning or operating such a facility . . . ." 42 U.S.C. § 9601(20)(A). Both the Supreme Court and Ninth Circuit have observed that this definition is a tautology. *See United States v. Bestfoods*, 524 U.S. 51, 56 (1998); *Kaiser Aluminum & Chem. Corp.*, 976 F.2d at 1341. The Supreme Court, however, provided guidance on the meaning of operator liability in *United States v. Bestfoods*, 524 U.S. 51 (1998). Operator liability under § 107(a)(2) of CERCLA attaches if a person "manage[s], direct[s], or conduct[s] operations specifically related to [the] pollution, that is, operations having to do with the leakage or disposal of [the] hazardous waste." 524 U.S. at 66-67; *see also City of Moses Lake v. United States*, 458 F. Supp. 2d 1198, 1226 (E.D. Wash. 2006) (applying the *Bestfoods* standard). The definition of "operator" in *Bestfoods* "clearly requires actual participation, not merely the potential to do so." *City of Wichita, Kansas v. Trustees of APCO Oil Corp. Liquidating Trust*, 306 F. Supp. 2d 1040, 1054 (D. Kan. 2003); *see also United States v. Twp. of Brighton*, 153 F.3d 307, 314 (6th Cir. 1998) (describing *Bestfoods* as "highlight[ing] the importance of establishing some actual control by a putative operator"). Consistent with *Bestfoods*, the Ninth Circuit held that there is liability where a person had "actual control" of a facility and played an "active role in running the facility, typically involving hands-on, day-to-day participation in the facility's management." *Long Beach Unified Sch. Dist. v. Dorothy B. Godwin Cal. Living Trust*, 32 F.3d 1364, 1367 (9th Cir. 1994) ("*Long Beach*").

---

*Cauffman*, 21 E.R.C. 2167 (1984); *United States v. Wade*, 577 F. Supp. 1326, 1333 (E.D. Pa. 1983).

Mrs. Roberts accepted THS' proposal to remove the old boiler system and install a new system at the Property. Pursuant to the parties' agreement, Mrs. Roberts granted THS full access to the house and THS had full control over the activities related to the project. Based on these facts and consistent with *Bestfoods*, the Court concludes that THS is an operator under CERCLA because THS had actual control and the authority by contract to manage, direct, and conduct the boiler system removal operation at the Property. 524 U.S. at 66-67; *see also Am. Premier Underwriters Inc. v. Gen. Elec. Co.*, 2012 WL 4506271, at *6-8 (S.D. Ohio Sept. 30, 2012) (finding that GE was subject to "operator" liability because of "evidence in the record which shows that GE 'manage[d], direct[ed], or conduct[ed]' operations to the extent that it was involved in the problems with the transformers which leaked Pyranol").

### 2.  Facility

CERCLA defines the term "facility" broadly as follows:

> The term "facility" means (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

42 U.S.C. § 9601(9). The types of facilities described in subsections (A) and (B) are disjunctive and thus establish "two distinct definitions of what might constitute a facility." *Sierra Club v. Seaboard Farms Inc.*, 387 F.3d 1167, 1171 (10th Cir. 2004). The disjunctive structure of § 9601(9) means that "the term 'facility' enjoys a broad and detailed definition." *Bestfoods*, 524 U.S. at 56.

The Court concludes that the definition of facility encompasses the Property and adjacent areas where the mercury was "disposed of" or came "to be located." *See* 42 U.S.C. § 9601(9)(B);

*accord Twp. of Brighton*, 153 F.3d at 313 ("facility" broadly includes "an area that cannot be reasonably or naturally divided into multiple parts or functional units [and] should be defined as a single 'facility,' even if it contains parts that are non-contaminated").

### 3. Disposal

In order for THS to be liable, it must operate the facility at the time of a "disposal" of a hazardous substance. 42 U.S.C. § 9607(a). CERCLA defines "disposal" as "the *discharge,* deposit, injection, dumping, *spilling, leaking,* or *placing* of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." *See* 42 U.S.C. § 9601(29), referencing 42 U.S.C. § 6903 (emphasis added). The Ninth Circuit explained in *Carson Harbor Village, Ltd. v. Unocal Corp.* that although the term "disposal" does not include "passive soil migration," it may include other passive migrations that fit within the plain meaning of the terms used to define "disposal." 270 F.3d 863, 881 (9th Cir. 2001). Further, "'Congress did not limit [disposal] to the initial introduction of hazardous material onto property.'" *Id.* at 877 (quoting *Kaiser Aluminum*, 976 F.2d at 1342) (alterations in original). Importantly, "it is evident that CERCLA's primary targets included spills and leaks from *abandoned sites—sites at which there was no longer any affirmative human activity.*" *Id.* at 885 (emphasis added).

THS argues that there was no "disposal" at the Property when THS was removing the old boiler system. As discussed in the Court's Findings of Fact, however, THS personnel released mercury during the removal of the boiler from the Property. The Court concludes that this event itself is properly characterized as a "disposal" under CERCLA. Thus, the Court concludes that a disposal of hazardous substances occurred during the period of THS' operations at the Property.

### 4.  Response Costs

The final element of liability requires a plaintiff to establish that the "release" or "threatened" release caused the plaintiff to incur response costs that were "necessary" and "consistent with the national contingency plan ("NCP")." 42 U.S.C. §§ 9607(a)(4), (a)(4)(B). A PRP may be liable for:

> (A)    all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan; [and]
>
> (B)    any other necessary costs of response incurred by any other person consistent with the national contingency plan.

42 U.S.C. § 9607(a)(2), (a)(4)(A)-(B). Section 9607(a) "functions to distinguish between government response costs in subsection (A) and private response costs in subsection (B)." *Wash. State Dep't of Transp. v. Wash. Natural Gas Co., Pacificorp* ("*WSDOT*"), 59 F.3d 793, 800 (9th Cir. 1995) (citation and quotation marks omitted). Response costs are considered necessary when "an actual and real threat to human health or the environment exist[s]." *Colton*, 614 F.3d at 1003 (alteration in original). Moreover, the text of subsection (A) indicates that costs incurred by the United States are recoverable so long as they are "*not inconsistent with the [NCP]*." *WSDOT*, 59 F.3d at 799 (emphasis added). Costs incurred under subsection (A) therefore are "presumed" and "the potentially responsible party has the burden of proving inconsistency with the NCP." *Id.* at 799-800.

Although this is an action brought by a private party, the EPA incurred the costs at issue in this lawsuit. THS does not contest that the EPA's remediation at the Property was "necessary" or raise any challenge to the conclusion that the costs incurred by the EPA were consistent with the NCP. Thus, the Court concludes that the response costs incurred at the Property by the EPA were "necessary" and "consistent with the national contingency plan ("NCP")." 42 U.S.C.

§§ 9607(a)(4), (a)(4)(B); *see WSDOT*, 59 F.3d at 799-800; *see also Cal. ex rel. Cal. Dep't of Toxic Substances Control v. Neville Chem. Co.*, 358 F.3d 661, 673 (9th Cir. 2004) (response costs incurred by a state are presumed to be consistent with the NCP and the defendant bears the burden to show the state acted "in an arbitrary and capricious manner in choosing a particular response action").

## B.  The Parties' Service Contract

The next issue before the Court is whether the service contract between THS and Plaintiffs relieves THS from liability in this case.

### 1.  Release of Liability under CERCLA

Section 107(e)(1) of CERCLA provides that no indemnification agreement shall be effective to transfer CERCLA liability from a PRP under § 107 to another person, but that "[n]othing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section." 42 U.S.C. § 9607(e). This means that "all responsible parties . . . remain fully liable to the government, although they [are] free to enter into private contractual arrangements." *Jones-Hamilton Co. v. Beazer Materials & Servs., Inc.*, 973 F.2d 688, 692 (9th Cir. 1992) (citing *Mardan Corp. v. C.G.C. Music, Ltd.*, 804 F.2d 1454, 1459 (9th Cir. 1986)). Thus, a party cannot escape CERCLA liability by entering into an indemnity agreement, but can obtain contractual protection or reimbursement. William B. Johnson, Annotation, *Indemnification or Release Agreement as Covering Liability Under § 107(e) of Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) (42 U.S.C.A. § 9607(e))*, 139 A.L.R. Fed. 123, 139 (1997) ("[T]he indemnified party continues to remain fully liable . . .; [it] just has someone to share the expense with.").

### 2.  Contract Interpretation under Oregon Law

Under Oregon law, the objective in contract interpretation is to give effect to the parties' agreed-upon intentions. *See, e.g.*, *Connall v. Felton*, 225 Or. App. 266, 272 (2009) ("The goal [of contract interpretation] is always to give effect to the parties' intentions."). Oregon courts have established a three-step process for interpreting the provisions of a contract. First, the court determines whether, as a matter of law, the relevant provision is ambiguous. *McKay's Mkt. of Coos Bay, Inc. v. Pickett*, 212 Or. App. 7, 12 (2007). In considering whether a contractual provision is ambiguous, a court is limited to considering only the plain meaning of the words used by the parties in their contract and any extrinsic evidence showing the circumstances under which the contract was made. *See Batzer Constr., Inc. v. Boyer*, 204 Or. App. 309, 317-18 (2006); *Fogg v. Wart*, 2006 WL 3716745, at *5-7 (D. Or. Dec. 14, 2006); *see also* Or. Rev. Stat. § 42.220. "A contractual provision is ambiguous if its wording can, in context, reasonably be given more than one plausible interpretation." *Williams v. RJ Reynolds Tobacco Co.*, 351 Or. 368, 379 (2011) (citation omitted). In addition, "[t]he court must, if possible, construe the contract so as to give effect to all of its provisions." *Id.* If the provision is unambiguous, the analysis ends. *Id.* at 379-80.

Where a contractual provision is ambiguous, however, the factfinder must look beyond the four corners of the contract to discern, as a matter of fact, whether there is a mutual and common intention. *See Yogman v. Parrott*, 325 Or. 358, 363 (1997) (explaining that with an ambiguous contract provision, the trier of fact will "ascertain the intent of the parties and construe the contract term consistent with the intent of the parties"). The trial court may receive and consider extrinsic evidence relating to intent in order to resolve that question. *Id.* at 363-64. Because Oregon follows the objective theory of contracts, direct evidence at this stage may include expressions of any such common understanding actually communicated among the

PAGE 25 – FINDINGS OF FACT AND CONCLUSIONS OF LAW

parties, such as "the parties' communications and acts." *See Holdner v. Holdner*, 176 Or. App.

111, 120 (2001) (quoting *Real Estate Loan Fund Or. Ltd. v. Hevner*, 76 Or. App. 349, 354

(1985)). Statements of a party's subjective intent that were not expressed or communicated at the

time the contract was formed are not permissible evidence of intent. *See, e.g.*, *Fogg*, 2006 WL

3716745, at *9; *c.f. Holdner*, 176 Or. App. at 120-21.

In the absence of such direct evidence, the parties' course of dealing or their performance

during the term of the contract may provide circumstantial, or inferential, evidence of their

mutual and common understanding, if any, concerning the ambiguous provision. *See Yogman*,

325 Or. at 364 (the parties' "practical construction of an agreement may hint at their intention"

(citing *Tarlow v. Arntson*, 264 Or. 294, 300 (1973)). In the absence of any such direct or

circumstantial evidence, or if the contract remains ambiguous after considering any such

evidence, the third step is to apply any relevant maxims of construction. *See id.*

### 3.  Liability Disclaimer in the Parties' Contract

The contract between Plaintiffs and THS for the installation of the new boiler contained

one page of "standard terms and conditions," including the following:

> Liability Disclaimer – in no event shall The Heating Specialist Inc.
> be liable for any incidental or consequential damages resulting
> from the use, misuse, or inability to use the products and services
> of the Company. This exclusion applies regardless of whether such
> damages are sought based on breach of warranty, breach of
> contract, negligence, strict liability in tort, or any other legal
> theory. Should The Heating Specialist Inc. be found liable for any
> such damages, they shall be limited to the purchase price of the
> equipment.

The operative sentence in the "Liability Disclaimer" provides that THS is not liable for damages

"*resulting* from the use, misuse, or inability to use the products and services of the Company."

(emphasis added). The Court must determine if this operative sentence, the meaning of which is

disputed by the parties, is an effective release of liability under Oregon law.

"A release is a contract in which one or more parties agrees to abandon a claim or right." *Lindgren v. Berg*, 307 Or. 659, 665 (1989). A release provision is "subject to the ordinary rules of contract construction and interpretation." *Patterson v. Am. Med. Sys., Inc.*, 141 Or. App. 50, 53 (1996). For a release agreement to be valid, "there must be both the knowledge of the existence of the claim and an intention to relinquish it, in the absence of a specific promise to release liability for unanticipated claims." *Id.*; *see also In re Kulka's Estate*, 142 Or. 104, 115 (1933) (to be valid and binding, a release must be executed with full knowledge of the import of what is being signed and with the intent to discharge from liability); *see also Peplinski v. Constr. Contractors Bd.*, 183 Or. App. 419, 425 (2002) (holding that the "release from further performance [did] not constitute a release from a claim for damages for negligent work already performed" because nothing in the contract suggested the scope of the release was so broad). In addition, a court may also find a release provision void as contrary to public policy. *Bagley v. Mt. Bachelor, Inc.*, 258 Or. App. 390, 403 (2013). In evaluating whether a contract disclaiming liability is contrary to public policy, a court "assesses the language of the agreement under the circumstances in order to determine whether it violates public policy 'as applied' to the facts of the particular case." *Id.* (citation omitted).

"Although agreements to limit liability are not favored, neither are they automatically void." *Mann v. Wetter*, 100 Or. App. 184, 187 (1990) (en banc). A contract that immunizes a party from "the consequences of his or her own negligence" is "enforceable under limited circumstances." *Estey v. MacKenzie Eng'g Inc.*, 324 Or. 372, 276 (1996). A contract may provide "'immunity from the consequences of a party's own negligence'" where "'that intention is clearly and unequivocally expressed.'" *Id.* (quoting *Transamerica Ins. Co. v. U.S. Nat'l Bank of Or.*, 276 Or. 945, 951 (1976)). Where the court finds the contract to be ambiguous, that

"'ambiguous instrument . . . will be construed against the party who drafted it.'" *Id.* Courts look to "both the 'language of the contract' and 'the possibility of a harsh or inequitable result that would fall on one party' if the other were immunized from the consequences of its own negligence." *Steele v. Mt. Hood Meadows Or., Ltd.*, 159 Or. App. 272, 276 (1999) (quoting *Estey*, 324 Or. at 376). The potential for an inequitable result "turns on the 'nature of the parties' obligations and expectations under the contract.'" *Id.* (quoting *Estey*, 324 Or. at 376-77).

THS contends that the operative clause in the Liability Disclaimer extends to any and all damages that are related to its products and services. The Court disagrees. The text cited by THS does not unambiguously disclaim all liability because it only references damages "resulting from the use, misuse, or inability to use the products and services of the Company." (emphasis added). It is not clear whose "use, misuse, or inability to use the products and services" the contract references. For example, the most logical reading of this clause would be: "in no event shall The Heating Specialist Inc. be liable for any incidental or consequential damages resulting from the *Customer's* use, misuse, or inability to use the products and services of the Company." This reading indicates that if Plaintiffs suffered damages based on Plaintiffs' use, misuse, or inability to use the new boiler system installed by THS, THS would not be liable for such damages, even if these damages were based "on breach of warranty, breach of contract, negligence, strict liability in tort, or any other legal theory." Thus, the Liability Disclaimer, when read in the most logical way, and certainly in a reasonable way, is silent as to THS' potential liability for damages *unrelated* to Plaintiffs' use, misuse, or inability to use the products and services of THS.

THS' alternative construction is that THS is not liable for any damages that are the result of THS' negligence. The relevant provision in the Liability Disclaimer is not so far reaching. The argument that the clause references *THS'* "use, misuse, or inability to use the products and

services of the Company" leads to a nonsensical reading of the clause. It is unclear why THS would disclaim liability for damages *it* suffers as a result of its own "use, misuse, or inability to use" its own products and services. Further, it is also unclear why THS would use, misuse, or have an inability to use its own products and services when THS is the party *providing* products and services to customers. Based on the most reasonable interpretation of the text of the Liability Disclaimer, the types of damages that are disclaimed are limited to damages resulting from the customer's use, misuse or inability to use THS' products and services. The resulting damages do not to extend to "any and all claims" that are in any way related to THS' work at the Property. *Cf. Williams*, 351 Or. at 383 (reasoning that a release provision did not bar recovery because although the release broadly referenced "'any and all manner' of various types of claims," the definition of "Released Claims" in the contract was limited to a *specific type* of conduct).

The sentence immediately following the operative clause in dispute provides further context and supports the Court's conclusion. That sentence reads: "This exclusion applies regardless of whether such damages are sought based on breach of warranty, breach of contract, negligence, strict liability in tort, or any other legal theory." The sentence does not broaden the scope of the liability disclaimer to extend to all negligence claims. Instead, the sentence means that if customer suffers damages resulting from its use, misuse, or inability to use the boiler, such damages are not recoverable even if they are "based on" or caused by a negligent act. For example, if Plaintiffs suffer damages because they cannot *use* the boiler because it was negligently installed, THS would not be liable for damages. Unlike the previous example, the damages Plaintiffs allege in *this action* are unrelated to Plaintiffs' "use, misuse, or inability to use the products and services" of THS—they are based on separate actions taken by THS while THS was at the Property. The Court therefore concludes that the liability disclaimer only extends

to damages resulting from Plaintiffs' "use, misuse, or inability to use" the products and services of THS and not to damages that result separately from actions taken by THS.

Accordingly, because the scope of the Liability Disclaimer only covers damages resulting from Plaintiffs' use of THS' products and services, Plaintiffs did not have knowledge of a liability disclaimer based broadly on any negligent act of THS. Thus, Plaintiffs did not intend to relinquish such a claim against THS. *See In re Kulka's Estate*, 142 Or. at 115; *see also Peplinski*, 183 Or. App. at 425 (declining to interpret broadly the scope of a release agreement). This lack of clarity also means that THS does not have immunity from its own negligence because such an intention was not "clearly and unequivocally expressed" in the contract. *See Estey*, 324 Or. at 276.

The damages resulting from the mercury spill at the Property are unrelated to a claim for damages resulting from Plaintiffs' use or misuse of THS' products and services. Thus, the Court concludes that the Liability Disclaimer in the parties' contract does not prevent Plaintiffs from pursuing their CERCLA § 113 contribution claim against THS.

## C. Allocation of CERCLA Liability

After liability is established, the court allocates liability "using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f)(1). "This language gives district courts discretion to decide what factors ought to be considered, as well as the duty to allocate costs according to those factors." *Boeing Co. v. Cascade Corp.*, 207 F.3d 1177, 1187 (9th Cir. 2000). Section 113 of CERCLA does not require the court to consider any particular list of factors. Rather, courts often "use what are called the 'Gore factors,' named after a failed attempt to amend CERCLA." *Id.* These factors include:

> (i) the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished; (ii) the amount of the hazardous waste involved;

> (iii) the degree of toxicity of the hazardous waste involved; (iv) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste; (v) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and (vi) the degree of cooperation by the parties with the Federal, State or local officials to prevent any harm to the public health or the environment.

*Carson Harbor Village, Ltd.*, 270 F.3d at 893-94 (citation and quotation marks omitted).

In addition, courts also consider the so-called "Torres Factors," which include: (1) "[t]he extent to which cleanup costs are attributable to wastes for which a party is responsible"; (2) "[t]he party's level of culpability"; (3) "[t]he degree to which the party benefitted from disposal of the waste"; and (4) "[t]he party's ability to pay its share of the cost." *Lockheed Martin Corp. v. United States*, --- F. Supp. 2d. ---, 2014 WL 1647147, at *22 (D.D.C. Apr. 22, 2014); *see also United States v. Davis*, 31 F. Supp. 2d 45, 63 (D. R.I. 1998). Although CERCLA prohibits double recovery for response costs, *see* 42 U.S.C. § 9614(b), CERCLA allows for declaratory judgments to allocate liability for future response costs in § 107 actions, *see* 42 U.S.C. § 9613(g)(2).

Of relevance to this case, the Court considers the following five factors:

1. The ability of the parties to demonstrate that their contribution to a discharge, release, or disposal of a hazardous waste can be distinguished.

As noted in the Findings of Fact above, the initial release of mercury at the Property is attributable to THS. Mrs. Roberts, however, made matters worse by spreading mercury from areas with high concentrations to areas of low concentrations during her independent cleanup efforts. Neither party presented any explicit way to quantify the degree of Mrs. Roberts' activities. Before the EPA's cleanup efforts, Mrs. Roberts received an estimate from Waste Management for $14,000 to remediate the contamination at the Property. Mrs. Roberts, however,

assumed that there were only nine cubic centimeters of mercury at the Property. As noted above, at least four fluid ounces of mercury were at the Property and, as a result, Waste Management's estimate does not establish how much Mrs. Roberts' efforts exacerbated the mercury contamination at the Property. Further, neither Plaintiffs nor THS presented evidence that the spread of mercury at the Property is attributable to the actions of IRS or Gordon.

     2.   The degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste.

The initial release of mercury is attributable to THS. After THS released mercury onto the Property, however, Mrs. Roberts, for a while, had sole discretion regarding how to handle the mercury spill. It was Mrs. Roberts' actions at the Property that had the effect of spreading mercury that otherwise would have been more contained. Although neither party quantified the effect of Mrs. Roberts' remediation efforts, the Court notes that a portion of the spread of mercury is directly attributable to Mrs. Roberts.

     3.   The degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste.

Regarding THS, Mr. Loennecker and Daniel Brent explained that they did not see a Honeywell heat generator and that they were not even aware of such a device before this litigation. Mrs. Roberts, on the other hand, was fully aware that there was mercury present at the Property. With that knowledge, Mrs. Roberts initially prevented Mr. Fowlow from accessing the Property. In order to undertake cleanup efforts on her own, Mrs. Roberts also delayed her initial meeting with Mr. Fowlow. Although Mrs. Roberts believed she had the relevant knowledge needed to remediate the mercury contamination, her admissions to Mr. Fowlow demonstrate that even basic safety precautions and proper waste disposal procedures did not occur.

4. The degree of cooperation by the parties with the Federal, State, or local officials to prevent any harm to the public health or the environment.

There is no evidence that THS failed to cooperate with Federal, State, or local officials. In fact, such interactions were entirely managed by Mrs. Roberts. Although the Court believes that Mrs. Roberts did cooperate with Mr. Franklin from the EPA, there is substantial evidence that she failed to cooperate with Mr. Fowlow. Mrs. Roberts' failure to cooperate with the EPA's Mr. Fowlow resulted in the EPA incurring legal costs in order to gain access to the Property. Mrs. Roberts' actions likely exacerbated the contamination at the Property and required the EPA to take immediate action.

5. The parties' ability to pay their share of the costs.

The final factor the Court considers is the parties' ability to pay the remediation costs. THS submitted evidence that it is only "breaking even" and not making a profit this fiscal year, has limited financial resources, and its insurance carrier initially denied coverage on THS' claim involving this matter. Plaintiffs, although they did not submit detailed financial data, argue that they are in the middle of a bankruptcy proceeding and also have limited financial resources. The Court finds that this factor does not weigh strongly in favor of either party.

In sum, the task of allocating liability in a §113(f) CERCLA contribution action often "'escapes any degree of precision.'" *Waste Mgmt. of Alameda Cnty., Inc. v. E. Bay Reg'l Park Dist.*, 135 F. Supp. 2d 1071, 1099 (N.D. Cal. 2001) (quoting *Browning-Ferris Indus. of Ill., Inc. v. Ter Maat*, 13 F. Supp. 2d 756, 781 (1998)). The number of factors in this case that are not quantifiable makes this Court's decision no different. As a matter of equity, however, the Court in its discretion and considering the entirety of the record concludes that THS should be allocated sixty (60) percent liability for past and future response costs incurred at the Property

because THS caused the initial release of mercury. The Court allocates the remaining forty (40) percent of liability to Plaintiffs because of Mrs. Roberts' role in spreading the contamination and requiring the EPA to incur legal expenses in order to remediate.

## CONCLUSION

Based on the evidence presented at trial, the Court finds that Plaintiffs have met their burden in proving that Defendant THS is liable under Section 113 of CERCLA. Further, the Court finds that THS is responsible for 60 percent of past and future response costs incurred at the Property, and Plaintiffs are responsible for 40 percent of such costs. The Court orders the parties to submit a proposed judgment consistent with the Court's Findings of Facts and Conclusions of Law within fourteen (14) days of this Opinion and Order.

**IT IS SO ORDERED**.

DATED this 5th day of August, 2014.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge